UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DEBRA C. KASMIRE,

                      Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                      Defendant.

**REPORT AND
RECOMMENDATION**

07-CV-0144(T)(M)

---

This case was referred to me by Hon. Richard J. Arcara to hear and report in accordance with 28 U.S.C. §636(b)(1) (Dkt. # 16).[1]  Before me are the parties' cross-motions for judgment on the pleadings pursuant to Fed. R. Civ. P. ("Rule") 12(c) (Dkt. ##8, 11).  For the following reasons, I recommend that defendant's motion for judgment on the pleadings be DENIED, and that plaintiff's cross-motion be GRANTED.

## PROCEDURAL BACKGROUND

Pursuant to 42 U.S.C. §405(g), plaintiff seeks review of the final decision of the Commissioner of Social Security, denying her application for Disability Insurance Benefits ("DIB")(Dkt. #1).  Plaintiff filed an application for DIB on April 30, 2001 (T45-51).[2]  This claim was initially denied on October 25, 2001 (T27-30).  A hearing on the claim was conducted before

---

[1]      Judge Arcara later reassigned the case from himself to Hon. Michael A. Telesca (Dkt. #13).

[2]      References to "T" are to the certified transcript of the administrative record filed by the defendant in this action.

Administrative Law Judge Bruce R. Mazzarella on July 17, 2003 (T301-352, 653-697).  Plaintiff

was represented at the hearing by Kenneth R. Hiller, Esq. (T31-32).  On October 15, 2003, ALJ

Mazzarella issued a decision denying plaintiff's claim (T14-25).  ALJ Mazzarella's

determination became the final decision of the Commissioner on March 8, 2004, when the

Appeals Council denied plaintiff's request for review (T6-8).  Plaintiff filed a civil action

(Kashmire v. Barnhart, 04-CV-00185 (JTE/HBS)) with this court.  On July 7, 2004, Hon. John T.

Elfvin executed a stipulation remanding the case (T425).

On remand, a hearing was conducted before ALJ Mazzarella on May 11, 2005

(T698-730).  Plaintiff was again represented at the hearing by Mr. Hiller (T383-385).  After

considering the case *de novo*, on June 1, 2005, ALJ Mazzarella denied plaintiff's claim, finding

that she was not disabled from May 1, 1999, her alleged onset date, through September 30, 2002,

the date she was last insured (T389-398).  ALJ Mazzarella's determination became the final

decision of the Commissioner on February 3, 2007, when the Appeals Council denied plaintiff's

request for review (T353-355).


## THE ADMINISTRATIVE RECORD

I.   **Medical Evidence**

A.   **Evidence Prior to the Alleged Onset Date**

On September 16, 1991, plaintiff (DOB: 6/30/55) received physical therapy from

Karen MacNamara, PT (T163).  Plaintiff reported that she injured her shoulder three years prior

when she fell down the stairs and received treatment for the same problem in September 1990

(Id.).  Her injury had improved somewhat over the previous summer, but the pain recently caused

-2-

her to cut her work hours at McDonald's from twenty to three hours (Id.). Plaintiff stated the pain increases when she reaches over her head, holds her arms out to the side, and carries a gallon of milk (Id.). An October 18, 1991 MRI of the right shoulder was "consistent with tendinitis of the supraspinatus" (T164).

On August 2, 1993, plaintiff was treated at Kaehler Memorial Medical Clinic for complaints of cramping in both legs, as well as lower back and right hip pain (T166). On August 5, 1993, plaintiff reported that her medications helped the muscle spasms in her calves, but still complained of lower back pain (T165).

On August 24, 1994, plaintiff was treated by orthopedic surgeon, Paul H. Wierzbieniec, M.D., for complaints of right shoulder and right knee pain (T167). Dr. Wierzbieniec diagnosed plaintiff with scapular bursitis and injected her shoulder with Celestone.

On July 21, 1998, plaintiff treated with Myron L. Glick, M.D., for the flu, her obesity, and hypothyroidism (T188). Dr. Glick noted that plaintiff appeared depressed and encouraged her to lose weight via diet and exercise (Id.). At that time plaintiff weighed 322 lbs. and was prescribed Prozac for appetite suppression (Id.).


**B.      Evidence During the Relevant Period**

On June 16, 1999, Dr. Glick noted that plaintiff had lost 15 lbs., but complained of knee, hip, and shoulder pain (T187). He diagnosed plaintiff with obesity, degenerative joint disease, and hypothyroidism, but Dr. Glick ruled out hypertension and obstructive sleep apnea (Id.).

On Dr. Glick's referral, plaintiff was examined by Daniel Rifkin, M.D., of the Sleep Disorder Center of Western New York on July 26, 1999 (T168). A sleep study indicated "significant obstructive sleep apnea with associated disruption in sleep architecture and oxyhemoglobin saturation, especially during REM sleep" (Id.). Plaintiff's CPAP machine provided considerable improvement of her obstructive sleep apnea (Id.).

July 19, 1999 x-rays of plaintiff's knees revealed "minimal narrowing of the medial knee joint compartments, which may be due to early osteoarthritis" (T212). A July 23, 1999 x-ray of plaintiff's chest revealed "no evidence of acute cardiopulmonary process" (T211). A December 29, 1999 radiology report found degenerative joint disease in plaintiff's hand, right hip, and right pelvis (T202).

On August 19, 1999, Dr. Glick noted that plaintiff had lost 11 lbs. on Prozac (T186). He diagnosed plaintiff with obstructive sleep apnea, degenerative arthritis of the knees, and obesity (Id.). He instructed plaintiff to use a CPAP machine at night and to lose weight (Id.). On March 13, 2000, plaintiff informed Dr. Glick that she wanted to lose weight, but had gained 10 lbs. and was unable to maintain a diet (T185). Plaintiff continued to complain of severe knee, ankle, and right hip pain on June 14, 2000, but admitted that Celebrex provided some relief for her osteoarthritis (T184). At that time, plaintiff weighed 325 lbs. and Dr. Glick noted that her obesity "is affecting everything" (Id.). However, he also noted that she had full range of motion in her back and knees (Id.). On July 6, 2000, plaintiff complained of shortness of breath and arthritic pain in her hips and hands, and that her ankles and the tips of her feet were swollen (T183).

On August 15, 2000, plaintiff weighed 335 lbs. and complained of joint, right hip, back, and neck pain (T182). Dr. Glick noted that plaintiff's "morbid obesity" produced "multiple resulting problems" (Id.). He also noted signs of depression (Id.). Dr. Glick recommended an aggressive diet and indicated that he would consider medical and surgical options if this failed to help (Id.). On September 14, 2001 plaintiff weighed 339 lbs. and "failed weight watchers eats too much, no exercise" (T181 (emphasis in original)). Dr. Glick noted that "morbid obesity is having serious consequences on plaintiff's health" (Id.).

On May 7, 2001, Dr. Glick noted that plaintiff had lost 4 lbs. (T180) and referred plaintiff for an echocardiogram which was conducted on May 16, 2001, but findings were limited due to plaintiff's obesity, which prevented an adequate examination of plaintiff's left ventricle function (T179). On June 6, 2001, plaintiff complained to Dr. Glick that she had "difficulty breathing and a pain in the back of [her] leg" (T178). On July 5, 2001, plaintiff was treated by Dr. Glick for an abrasion on her lower leg after she fell through a deck (T177). At that time plaintiff had lost 8 lbs. (Id.). Plaintiff was referred to a pulmonologist (Id.).

On July 27, 2001 Gregory Phillies, M.D., x-rayed plaintiff's knees and found "degenerative joint disease changes of the knee predominately involving the patellofemoral compartments of the left and right knee" (T237). However, there were "no significant degenerative joint disease changes seen involving hips" (Id.). On Dr. Glick's referral, plaintiff was examined by Nashat H. Radbadi, M.D., F.C.C.P., on July 30, 2001 (T229). Dr. Radbadi noted that: "working diagnosis at this time includes asthma. Possibilities of pulmonary hypertension should be thought about, as well as chrona venothromboembolic disease with unresolved pulmonary embolia" (Id.). Dr. Radbadi started plaintiff on Serevent and Flovent and

ordered a chest x-ray (T229).  The chest x-ray performed on July 30, 2001 by Paul Montgomery,

M.D., found "no acute disease", plaintiff's heart was not enlarged, there was "no evidence of

hilar or mediastinal mass", and plaintiff's lungs did not show any evidence of "infiltrate or

pulmonary vascular congestion" (T230).

On Dr. Glick's referral, Vinkay K. Reddy, M.D., performed a rheumatology

evaluation on August 1, 2001 (T235-236).  Dr. Reddy found plaintiff to be "slightly obese"

(T235).  Dr. Reddy diagnosed plaintiff with "knee osteoarthritis, a trace of left hip osteoarthritis

along with right shoulder bursitis" (T236).  However, hip and knee ranges of motion were intact

(Id.).  Plaintiff did not have any features suggestive of inflammatory arthritis.  Dr. Reddy advised

plaintiff to continue Celebrex and to "lose weight to help with her joint pain" (Id.).

On September 10, 2001, plaintiff received a pulmonary function analysis which

found that "FVC, FEV1, FEV1/FVC and mild-expiratory flows are normal.  No response to

inhaled bronchodilators.  MVV is minimally reduced.  Diffusion capacity is moderately reduced.

Disproportionate reduction in DLCO suggests parenchymal disorders, pulmonary vascular

pathology, obesity-hypoventilation syndrome and/or anemia" (T221).

On September 10, 2001, plaintiff reported to Dr. Reddy that her knees felt better

after trigger point injections, but that it did not help her right shoulder pain (T234). Dr. Reddy

referred plaintiff for an MRI of her right shoulder and cervical spine, which found that her

cervical spine had a "diffuse annular bulge at C6-C7 and no apparent spinal stenosis" (T234,

290) and her right shoulder had "spurs at the acromioclavicular joint indicative of shoulder

impingement syndrome", but there was no evidence of a rotator cuff tear or apparent muscle

atrophy (T291).

-6-

Dr. Glick referred plaintiff to chiropractor, Anthony M. Caruso, Sr., D.C., on

December 19, 2001.  He tested the range of motion of plaintiff's lumbar spine, finding that

> "flexion was restricted at 50 degrees producing low back pain;
> extension was restricted at 10 degrees producing low back pain;
> right lateral flexion was restricted at 30 degrees producing low
> back pain; left lateral flexion was restricted at 20 degrees
> producing low back pain; right and left rotation were both
> performed at 30 degrees, but did produce low back pain when
> performed on the left" (T249).

Dr. Caruso also found that plaintiff "appears to be suffering from a Lumbar Sprain/Strain,

Myofascitities and Lumbar Subluxation", and stated that his treatment will consist of "spinal

manipulation, electric (inferential) stimulation and hydroculator pack therapy" (T250).

On January 18, 2002, Dr. Caruso diagnosed plaintiff with a "Lumbar

Sprain/Strain, Radiculitis, Lumbar Subluxation, Myofascitis and Cervical Disc Protrusion"

and recommended plaintiff purchase a tens unit to help with pain management (T544). On

February 6, 2002, Dr. Glick enrolled plaintiff in the Univera weight reduction program (T266).

On Dr. Glick's referral, Eugene J. Gosy, M.D. performed a neurological

consultation on February 4, 2002 (T252).  Plaintiff presented numbness and dysesthesias in her

right lower extremities arising from her fall through a deck (Id.).  Dr. Gosy found that plaintiff

had a "superficial skin nerve injury", which caused persistent tingling (T253).  He recommended

that plaintiff be treated with Baclofen (Id.).  On March 13, 2002, plaintiff reported to Dr. Gosy

that Baclofen was only beneficial for a short period of time (T251).  Dr. Gosy found that plaintiff

was not in acute distress, her cranial nerves II-XII and deep tendon reflexes were intact, and there

was tenderness along the medial border of the right scapula (Id.).  He prescribed Neurontin and a

Lidoderm Patch (Id.).  On April 24, 2002, plaintiff reported to Dr. Gosy that her medications

were "slightly effective in relieving her symptoms", but she was "still experiencing quite a bit of numbness and tingling in her upper and lower extremities" (T601).  On May 29, 2002, plaintiff reported to Dr. Gosy that her "current medications are helping to make her pain tolerable, but by no means is she pain free" (T263).  Plaintiff also reported "having quite a bit of dysesthesias in her upper extremities" (Id.).

On June 19, 2002, Dr. Glick reported that plaintiff had lost five lbs. on Meridia for a total weight loss of 40 lbs. (T266).  Plaintiff's depression was stable (Id.).

### C.     Evidence After the Date Last Insured

On October 29, 2002, Dr. Glick noted that plaintiff was "very depressed today prozac not helping" (T265).  Plaintiff continued to lose weight on Meridia and was 292 lbs. (Id.).  On November 20, 2002, Dr. Glick reported that plaintiff "felt much better on Zoloft instead of prozac", but her weight had increased to 300 lbs. (T264).  On January 15, 2003, Dr. Glick reported that plaintiff was obese, depressed, and had a normal gynecological exam (T269).

Between January 21, 2003 and February 10, 2003, plaintiff received acupuncture treatment from Herbert K.Y. Lau, PH.D., LAC, for complaints of pain in her right shoulder, knee, lower back, and to treat her obesity (T284).  Mr. Lau reported that plaintiff's "overall condition remains the same except for a slight improvement in her knee pain" (T284).

On February 28, 2003, plaintiff visited Dr. Glick to "address obesity, wants surgery" (T268).  Dr. Glick noted that plaintiff had lost 50 lbs., but still weighed approximately 300 lbs. (Id.).  He diagnosed plaintiff with osteoarthritis, depression, restrictive lung disease, and sleep apnea (T268).

On July 17, 2003, plaintiff was treated by Dr. Caruso for complaints of low back and right leg pain (T543). Dr. Caruso's objective findings included:

> "On active range of motion testing in the lumbar region, flexion, [extension, lateral flexion, and rotation were] moderately restricted by pain. Kemp's test was found to be positive bilaterally for the lower back pain. Supine straight leg raise was positive on the right at 40 degrees for the right leg pain. Braggard's test was positive on the right for the right lower extremity symptoms. The right achilles reflex was found to be 0. The left achilles reflex was noted to be 1. The right [and left] patellar reflex[s] [were] found to be 2. The right S1 dermatome was found to be hypoesthetic via pinprick. All other lower extremity dermatomes are within normal limits. On palpation, moderate to severe spasm and tenderness were observed in the lumbo-sacral region on the right. All active cervical ranges of motion were normal" (Id.).

On July 29, 2003, Steven Celotto D.C. (Dr. Caruso's associate), noted that "the initial objective findings are decreasing" and that "her low back pain has improved and that her right leg pain has remained unchanged" (T542).

On Dr. Glick's referral, plaintiff was examined by laproscopic surgeon, Alan Posner, M.D., on July 30, 2003 (T642-646). It was his "impression that [plaintiff] does indeed have morbid obesity with the co-morbidities of sleep apnea, arthritis of the knees, hips, lower back, asthma, gastroesphageal reflux disease and depression" (T644). An upper gastrointestinal series performed on August 12, 2003 found: "Moderate sliding hiatal hernia with marked reflux with some esophageal spasm. No acute abnormality otherwise noted throughout the gastrointestinal tract visualized" (T531).

On September 18, 2003, plaintiff treated with Dr. Glick for her chronic depression (T565). Dr. Glick noted that plaintiff's chronic dysthymia was exacerbated by plaintiff's obesity and medical problems (Id.). On October 15, 2003, Dr. Glick diagnosed plaintiff with type II

diabetes (T564).  On June 26, 2004, Dr. Glick noted that plaintiff's insurer had refused to authorize Meridia for patient and "this is unfortunate as weight reduction is critically important to [plaintiff's] health" (T562).

In a January 16, 2005 letter, Dr. Glick stated, *inter alia*, that plaintiff "is morbidly obese >300lbs  [Body Mass Index ("BMI")] >40 and suffers from obstructive sleep apnea, asthma, diabetes and severe osteoarthritis.  Her obesity severely affects these medical problems" (T608).

On February 12, 2005, plaintiff was cleared for gastric bypass surgery (T607), but her April 2005 surgery was cancelled due to "out of pocket costs" (T629).

On April 22, 2005, Dolores Hakes, LCSW-R, Staff Counselor for the Samaritan Center, reported she had treated plaintiff on three occasions since February 3, 2005 and that plaintiff was presenting "with problems of depression and anxiety caused difficulty in participating in activities she used to enjoy due to chronic pain" (T624).  She also noted that it was "not possible at [that] time to assess if her symptoms, both physical and emotional, would be reduced if her body was less taxed by the excess weight" (Id.).

On Dr. Glick's referral, plaintiff was examined by psychiatrist Richard G. Bennet, M.D., on May 4, 2005, who found that plaintiff suffered from major depression and anxiety (T652).

On Dr. Glick's referral, orthopedic surgeon Marc S. Fineberg, M.D. examined plaintiff on July 28, 2005 and found that plaintiff suffered "DJD, possible meniscal tear, all compounded by morbid obesity" (T379).  An Electrodiagnostic study by James J. Czyrny, M.D.,

on November 9, 2005, found "a bilateral, moderately severe, ulnar entrapment syndrome at the level of the elbow, *i.e.*, cubital tunnel syndrome" (T371).

A November 22, 2006 MRI of plaintiff's lumbar spine found "Central Degenerative Disc protrusion at the L5-S1 Level and at the T12-L1 Level. There is otherwise no disc extrusion or spinal stenosis. Well circumscribed low T1-Bright T2 signal lesion . . . likely reflecting a benign hemangioma. . . . Incidental note made of a small central degenerative disc protrusion at the T12-L1 level" (T363-364). A MRI of plaintiff's right shoulder taken on the same date found "mild impingement syndrome . . . there is otherwise no evidence for [*sic*] a partial or full thickness rotator cuff tear" (T365).

### D.    Assessments Completed by Plaintiff's Treating Physicians

On July 12, 2003, Dr. Glick completed a Physical Capacities Evaluation for plaintiff (T162). Dr. Glick found that plaintiff could sit for an hour at a time and could sit 2 hours total during an eight hour day, but could not stand or walk at all (Id.). He also found that plaintiff could not lift or carry any weight, could not perform repetitive, simple grasping in either hand, could not push or pull arms, and could not manipulate items (Id.). Plaintiff was unable to use feet for repetitive movement, such as pushing or pulling and could not bend, squat, crawl, climb or reach (Id.). Dr. Glick noted that plaintiff has been limited in these capacities since April 1, 2001 and reported that plaintiff is disabled from full-time competitive employment (T162, 286).

On October 13, 2004, Dr. Glick completed a Medical Source statement of ability to do Work-Related Activities (Physical) (T553), which indicated that she could occasionally lift

or carry less than 10 lbs.; frequently lift and/or carry less than 10 lbs., stand and/or walk with

normal breaks, for less than 2 hours in an 8 hour workday, and sit, with normal breaks, less than

six hours in an 8 hour workday (T554). He noted that "plaintiff has severe shortness of breath

due to obesity (300 lbs.), lung disease (asthma), and has severe osteoarthritis. She can barely

walk, uses a cane" (T554). He determined that plaintiff can never climb, balance, kneel, crouch,

crawl, or stoop. He also found that plaintiff could occasionally reach in all directions (including

overhead). Plaintiff's environmental limitations included exposure to dust, humidity/wetness,

hazards (machinery, heights), fumes odors, chemicals and gases (T556). She had no limits to

exposure to temperature extremes, noise or vibrations (Id.).

On October 12, 2004, Dr. Lelnik completed a Medical Source Statement of

Ability To Do Work-Related Activities (Mental) (T557). Plaintiff's ability to understand,

remember, and carry out instructions, to respond appropriately to supervision, co-workers, and

work pressures in a work setting were not affected (T557-558).


### E.      Consultative Examinations/State Agency Review

Robert Keenan, M.D., performed a consultative orthopedic examination on

June 15, 2001 (T169). At that time, plaintiff weighed 334 lbs. and was 5' 4.5" (Id.).

Dr. Keenan found that plaintiff's "power was diminished in the right upper

extremity, compared to the left upper extremity, but it was still 5/5 despite this"; "straight leg

raising was to 90 degrees in a seated position, bilaterally"; "Tinel's and Phalen's signs were

negative bilaterally"; "was able to complete fine motor movements bilaterally"; and was unable

to heel and toe walk (T172).  "There was marked spasm in the right trapezius muscle area and right para-lumbar region.  No other spasm was evident" (T173).

On September 28, 2001, Jon S. Miller, M.D., a state agency review physician, completed a request for medical advice (T239).  Dr. Miller noted  that an August 2001 pulmonary examination "revealed normal heart an [*sic*] lung findings" (<u>Id</u>.).  He noted that plaintiff's sleep apnea studies "revealed better than 8% resolution with CPAP use" and that "there is no clinical documentation of hypersombulence or physician encounters of mental clouding" (<u>Id</u>.).  Dr. Miller determined that plaintiffs's impairment did not meet or equal the listing, "RFC- medium with respiratory environmental restrictions" (<u>Id</u>.).

On October 25, 2001, L. Norwood, a state agency review consultant, completed a physical residual functional capacity ("RFC") assessment which found that plaintiff could occasionally lift and/or carry 10 lbs.; frequently lift and/or carry less than 10 lbs.; stand and/or walk with normal breaks at least 2 hours in an 8 hour workday; sit for about 6 hours in an eight hour workday; and had an unlimited ability to push and/or pull (T242).  Plaintiff did not have any postural limitations (T243), but was limited in her ability to reach in all directions, including overhead, with her right arm (T244). Plaintiff was required to avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dust gases, poor ventilation, and hazards such as machinery or heights (T245).

## II.   First Administrative Hearing Conducted on July 17, 2003

### A.   Plaintiff's Testimony

Plaintiff weighed 305 lbs. at the hearing and testified that her weight reached a maximum of 365 lbs. during the previous year (T311). Plaintiff's previous work experiences included working at a casino at the change counter and as a dealer, at McDonald's as a cook and cashier, at a video store as a clerk, and as a bus aide (T315). Plaintiff stopped working on May 1, 1999 (T318). Plaintiff testified that she had a high school education and completed one year of college (T322). She did not have any vocational training (T323).

ALJ Mazzarella asked plaintiff to describe the problems she developed on or before September 30, 2002 (T324). In response, plaintiff testified that the major medical problems that prevent her from working are her shoulder, lower back, right hip, sciatic nerve, and frequent swelling in her joints (Id.). Plaintiff testified that she is only able to stand for less than ten minutes at one time. However, in 2002, she was able to stand up for about 15 minutes at one time (Id.). She had been unable to walk more than 10 feet without stopping for the last 2 years (Id.). She was prescribed a wheelchair by Dr. Glick and also was given a prescription for a walker, but had not filled it (T339).

Plaintiff stated that until the previous year she volunteered at a nursing home one day a week for 3 hours (T340). Plaintiff was a girl scout leader, but had to find other people to help her. Her work as a girl scout leader included making phone calls and planning activities. She attended functions if they are wheelchair accessible (T344).

Plaintiff testified that she awakes at 7:00 a.m. and prepares herself breakfast (T342). She reads and then lays down to rest at 10:00 or 11:00 a.m. for about 2 hours, then she

-14-

gets back up for another hour and then goes back to bed to lay down (Id.). If she is having a good day, she vacuums her living room, but if she is having a bad day, she reads and watches television (T343). Four days a week are usually bad days. She is unable to perform chores and has hired someone to assist with chores (T344). However, she cooks for herself and her husband (T348). Plaintiff goes grocery shopping with the aid of her husband and friends and goes to the movies with her husband (T349), but is unable to sit for an entire movie (T351).

      Plaintiff has been advised to lose weight over the years. She has tried Weight Watchers and medication (T351).

### B.    Post-Hearing Action

      On July 28, 2003, ALJ Mazzarella asked Dr. Glick to clarify whether his July 12, 2003 RFC assessment was based upon plaintiff's subjective complaints especially as they related back to April 1, 2001 (T295). In response, Dr. Glick stated "see PFT'S" (Id.). Dr. Glick was also asked whether his assessment was based upon objective evidence. In response, he stated "my records stand alone. [Patient] is morbidly obese . . . subjectively has many c/o's" (Id.).

      By letter dated August 1, 2003, Dr. Glick clarified his July 12, 2003 RFC assessment, noting that it was "supported by the clinical and objective findings of record, including:

    1.    Abnormal physical examination findings on my examination of the patient, as well as findings documented in the reports of Drs. Gosy, Caruso and Reddy;

    2.    Status post laceration/contusion to her right lower extremity, with residual pain and numbness;

3.      Lumbar lordosis;

4.      Bilateral varus deformity of her knees with effusion probably indicative of
        osteoarthritis;

5.      Osteoarthritis of the left hip;

6.      A clinical picture suggestive of inflammatory arthritis;

7.      Right shoulder bursitis;

7.[*sic*] Her response and lack thereof to medicinal and other treatment
        modalities" (T288).

**C.      ALJ Mazzarella's October 15, 2003 Decision**

ALJ Mazzarella determined that plaintiff had the following severe impairments:

obesity, right shoulder pain from bursitis and spurs with impingement, chronic arthritic changes

exacerbated by her obesity, mild degenerative disease of the right hip and pelvis, mild

degenerative joint disease of the knees and mild narrowing of joint space, mild degenerative

disease of the left hip; chronic lumbar strain and sprain, cervical degenerative disc disease and

chronic obstructive pulmonary disease ("COPD"), but concluded theses impairments were "not

severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart

P, Regulations No. 4" (T16).  He also regarded plaintiff's gastroesophagel reflux disease, thyroid

problem, depression, sleep apnea, and right lower leg injury, as nonsevere impairments because

they were controlled by medication or non-durational (Id.).

ALJ Mazzarella noted that while plaintiff does have severe impairments by

definition, he did not find her testimony and subjective complaints consistent with the credible

evidence of the record (T20).  He also did not give controlling weight to Dr. Glick's RFC

assessment, finding that it was not consistent with the "objective and clinical evidence of the record" (T21).

> ALJ Mazzarella found that plaintiff
>
> "had the residual functional capacity to sit two hours at one time and, with normal breaks and meal periods, up to eight hours in an eight-hour workday; stand and/or walk on an occasional basis and up to two hours in an eight-hour workday; lift and carry 20 pounds on an occasional basis. Because of discomfort, the claimant should not stoop, crouch, kneel or climb stairs on more than an occasional basis, and should not reach with her right upper extremity on more than an occasional basis. Due to COPD she should not work in unventilated work areas containing high concentrations of dusts, fumes, gases, and vapors" (T24).
>
> ALJ Mazzarella determined that plaintiff was unable to perform her past relevant

work (T24), but retained the RFC to perform the full range of sedentary work (T25).

## III.    Second Administrative Hearing Conducted on May 11, 2005

### A.    Plaintiff's Testimony

ALJ Mazzarella asked plaintiff to update him on any new developments in her condition since July 17, 2003 (T702). Although she had not testified about her depression at the first hearing, she stated that it interfered with her ability to work, and that she treated with a psychologist 16 months ago and has been seeing a counselor once a week and taking Effexor (T710-711).

Plaintiff testified that she has been using a wheelchair for the last 2 ½ years (T715). Plaintiff testified that her limitations were the same as described at the previous hearing (T715-716). Additionally, she testified that she could sit and stand for a period of three hours

before she would have to lay down or recline and could resume sitting and standing after thirty

minutes (T716).  Plaintiff testified that she no longer loads and unloads the dishwasher, goes to

the movies, or volunteers (T717-718).  Overall, plaintiff testified that her ability to stand, walk

and sit had worsened since the initial hearing (T718-719).


    **B.**    **Testimony of Vocational Expert Jay Steinbrunner**

       Mr. Steinbrunner testified that an individual who could sit up to two hours in an

eight hour workday, stand and walk on an occasional basis up to two hours in an eight hour

workday, lifting and carrying ten pounds on an occasional basis, and could not stoop, crouch,

kneel or climb stairs on more than an occasional basis, could not lift the right arm above shoulder

level on more than an occasional basis, and could not work in an unventilated work area,

containing high concentrations of dust, fumes, gases, vapors or temperature extremes, could

perform work as a gambling cashier and a full range of sedentary work (T726-727).

       The following exchange occurred concerning plaintiff's need to lie down or

recline every three hours:

> "Q.    All right.  Let's take another hypothetical then.  In this
> hypothetical, I want you to assume the individual could sit
> for an hour at one time, stand for ten minutes at one time,
> only alternate sitting and standing for three hours but then
> have to recline or lie down for 30 minutes, walk up to 10',
> lift up to a gallon of milk which is, I think, we want to take
> judicial notice that it weights 8.6 pounds.  You have that.
>
> A.    Yes, Your Honor.
>
> Q.    If those were my findings, could such a hypothetical
> individual perform any of the claimant's past work?

A.    Well, I could see the, the gambling cashier job still being able to be done. I'm not quite sure where the person would be afforded to lie down. That would have to be done a break but, normally, that would be --

Q.    You're not gonna get a break for 30 minutes every three hours, are you?

A.    Well, but you'll normally, doing this job, you'd have a 15-minute break after two hours, then you're two more hours and then you'd have an half hour or 45 minutes and then, I mean, it's gonna right on the edge there. I just don't know if there'd be a, accommodation there a bed or a couch or something she could like down --

Q.    So they'd mean a special accommodation to do that.

A.    Yeah. I mean --

Q.    Would the same be true of any work in the national economy under that hypothetical?

A.    Well --

Q.    Generally, you're not gonna get that kind of 30-minute lying or reclining every three hours, right?

A.    I, no. Generally, not.

Q.    Unless somebody wants to give you some kind of special accommodation.

A.    Yeah. I mean, probably the casino environment will be one where it might a, more readily available but, generally no. They're not gonna, they, go out to your car or your van and do it and recline I suppose but - -" (T727-729).

-19-

C.     **ALJ Mazzarella's June 1, 2005 Decision**

ALJ Mazzarella determined that plaintiff had the following severe impairments:

right shoulder pain from bursitis and spurs with impingement, arthritis of the right hip, right

pelvis, knees and left hip, lumbar spine strain, degenerative disc disease of the cervical spine,

chronic obstructive pulmonary disease, and obesity (T392).   However, he concluded that

plaintiff's impairments did not meet or equal the impairments listed in Appendix 1, Subpart P of

the Regulations (Id.).

ALJ Mazzarella found that the plaintiff "has a lot of medical problems that are

directly attributable to her obesity.  The record reflects numerous instructions from her doctors to

lose weight . . . .  However, the claimant has had numerous failed attempts to lose weight"

(T393).  ALJ Mazzarella determined that he could "not grant controlling weight or even great

weight to Dr. Glick's assessment of the claimant's ability to work" (T393).   In support of this

determination, ALJ Mazzarella cited a variety of factors, including:

> "Dr. Glick's assessed residual functional capacity of the claimant
> which is indicative of total disability is inconsistent with the
> objective and clinical evidence of record. Moreover, Dr. Glick's
> clarification of his assessed residual functional capacity of the
> claimant [Dr. Glick's August 1, 2003 letter] is not consistent
> with the reports of [Dr. Gosy].  Dr. Gosy basically treated the
> claimant for a leg injury which she did not even complain of at a
> hearing. . . . Chiropractor Caruso reported the claimant had
> relatively mild limitations when considering she could heel and toe
> walk without difficulty; and that her deep tendon reflexes of the
> patellar tendon were equal in spite of subjective complaints of pain
> and numbness.  In August 2001, [Dr. Reddy] . . . found the
> claimant only had mild knee arthritis, right shoulder bursitis and no
> significant arthritis of her left hip.  On September 10, 2001 Dr.
> Reddy reported the claimant's knees were feeling better after
> injection while she still had some right shoulder pain in spite of a
> trigger point injection.  Prior thereto on June 15, 2001 [Dr.

-20-

Keenan] disclosed the claimant has a history of increased
osteoarthritis with pain on range of motion of the right knee and
hip with documented findings.  However, x-ray evidence dated
July 19, 1999 showed the claimant has very minimal narrowing
secondary to early arthritis . . . .  The claimant's knee problems, hip
pain and right shoulder bursitis responded to overall care and use
of medication as reflected by the evidence as a whole with only
periods of increased symptoms at times, but clearly not of a level
as assessed by Dr. Glick . . . .  [T]he claimant's pulmonary function
studies were within normal limits . . . .  Dr. Glick's asserts [*sic*]
that the real basis for his opinion of the claimant's ability to work
is premised upon his treatment and the claimant's subjective
complaints.  But, Dr. Glick's treatment records are in themselves
inconsistent with his opinion.  Dr. Glick's treatment records also
documented on June 14, 2000 that the claimant had full range of
motion of her back and knees" (T394).

ALJ Mazzarella noted that the state agency's consultant, Dr. Miller, determined that plaintiff had

the RFC to perform medium work with respiratory environmental restrictions.  However, ALJ

Mazzarella "accorded the claimant the benefit of the doubt with regard to her obesity

superimposed on her other mild but significant impairments that warrants a reduction to

sedentary work" (T395).

ALJ Mazzarella "emphasized that the claimant is not credible with regard to her

complaint or medication use on and prior to her date last insured.  The claimant admitted daily

activity along with Girl Scout work and volunteer work, again consistent with sedentary level

work . . . .  The claimant attempted to minimize her activities and maximize her limitations.

Nonetheless, the claimant admitted that she does some meal preparation and loads and unloads

the dishwasher, goes grocery shopping with help and sometimes goes to the movies with her

husband" (T395).

ALJ Mazzarella concluded that plaintiff "has the residual functional capacity from her alleged onset date of May 1, 1999 through her date last insured of September 30, 2002 to lift and carry 10 pounds on an occasional basis; sit for 2 hours at one time and with normal breaks and meal periods for 8 hours in an 8 hour workday; stand and walk on an occasional basis and up to 2 hours in an 8 hour work day; that she should not stoop, crouch, kneel or climb stairs on more than an occasional basis; that she should not use her right arm above shoulder level on more than an occasional basis; and that she should not work in unventilated work areas containing high concentration of dusts, fumes, gases and vapors or temperature extremes" (T395).

Based upon this RFC and the testimony of the vocational expert, ALJ Mazzarella concluded that plaintiff could perform her past relevant work as a gambling cashier (T396).

## DISCUSSION AND ANALYSIS

### A.    Scope of Judicial Review

The Social Security Act states that, upon review of the Commissioner's decision by the district court, "[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. §405(g).  Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion".  Consolidated Edison Co. of New York, Inc. v. NLRB, 305 U.S. 197, 229 (1938).

Under this standard, the scope of judicial review of the Commissioner's decision is limited.  This Court may not try the case *de novo,* nor substitute its findings for those of the Commissioner.  See Townley v. Heckler, 748 F. 2d 109, 112 (2d Cir. 1984).  Rather, the

Commissioner's decision is only set aside when it is based on legal error or is not supported by substantial evidence in the record as a whole. See Balsamo v. Chater, 142 F. 3d 75, 79 (2d Cir. 1998). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the Court's independent analysis of the evidence may differ" from that of the Commissioner. Martin v. Shalala, 1995 WL 222059, *5 (W.D.N.Y. 1995) (Skretny, J.).

However, before deciding whether the Commissioner's determination is supported by substantial evidence, the court must first determine "whether the Commissioner applied the correct legal standard". Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999). "Failure to apply the correct legal standards is grounds for reversal." Townley, supra, 748 F. 2d at 112.

**B.    The Disability Standard**

The Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §1382c(a)(3)(A). The impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. §1382c(a)(3)(B).

The determination of disability entails a five-step sequential evaluation process:

"1.     The Commissioner considers whether the claimant is currently
        engaged in substantial gainful activity.

2.      If not, the Commissioner considers whether the claimant
        has a 'severe impairment' which limits his or her mental
        or physical ability to do basic work activities.

3.      If the claimant has a 'severe impairment,' the
        Commissioner must ask whether, based solely on medical
        evidence, claimant has an impairment listed in Appendix 1
        of the regulations.  If the claimant has one of these
        enumerated impairments, the Commissioner will
        automatically consider him disabled, without considering
        vocational factors such as age, education, and work
        experience.

4.      If the impairment is not 'listed' in the regulations, the
        Commissioner then asks whether, despite the claimant's
        severe impairment, he or she has residual functional
        capacity to perform his or her past work.

5.      If the claimant is unable to perform his or her past work,
        the Commissioner then determines whether there is other
        work which the claimant could perform.  The
        Commissioner bears the burden of proof on this last step,
        while the claimant has the burden on the first four steps."

Shaw v. Chater, 221 F. 3d 126, 132 (2d Cir. 2000); see 20 C.F.R. §§404.1520, 416.920.

**C.     Analysis**

**1.      ALJ Mazzarella Failed to Comply with the Treating Physician Rule.**

Plaintiff concedes that "arguably [there is] some support" for ALJ Mazzarella's

finding that "Dr. Glick's assessment of the claimant's RFC was not supported by the medical

evidence of record", but argues that "this alone would not render Dr. Glick's opinions

'inconsistent' with the evidence" because obesity can cause symptoms much greater than expected (Dkt. #11, p. 9). Therefore, "even if one accepts the ALJ's hypothesis that the objective medical findings do not support the ALJ's findings, this alone would not render Dr. Glick's opinions 'inconsistent' with the evidence" (Id.). Moreover, plaintiff argues that "given the inadequacy of Dr. Miller's RFC determination, and in particular, his failure to provide an analysis of the impact of the claimant's obesity and orthopedic problems on her RFC, the ALJ was left with no medical opinion, other than Dr. Glick's, which attempted to assess the impact of the claimant's obesity on RFC" (Dkt. #11, p. 12).

Defendant responds that ALJ Mazzarella properly rejected Dr. Glick's opinion "because it was inconsistent with the evidence as a whole including [his] own treatment notes" (Dkt. # 12 p. 5). Although the treating physician's opinion need not be given controlling weight where it is "contradicted by other substantial evidence in the record", Veino v. Barnhart, 312 F. 3d 578, 588 (2d Cir. 2002), the Commissioner must recite "good reasons" for not crediting the opinion. Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).[3] "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even - and perhaps especially - when those dispositions are unfavorable." Id. at 134.

In rejecting Dr. Glick's RFC assessment, which indicated total disability, ALJ Mazzarella found that it is "inconsistent with the objective and clinical evidence of the record" (T394). However, ALJ Mazzarella's decision does not indicate that he has sufficiently considered the combined effect of plaintiff's obesity on her other impairments. "The combined

---

[3]      "We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. §404.1527(d)(2).

effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone." Social Security Ruling ("SSR") 02-1P, 2000 WL 628049, *6.

Without specifying which impairments are attributable to plaintiff's obesity, ALJ Mazzarella found that plaintiff has "a lot of medical problems that are directly attributable to her obesity" (T393). He failed -as required by SSR 02-1P- to discuss the combined effect of plaintiff's obesity on her impairments, including her arthritis of the hips, right pelvis, knees and left hip, lumbar pine strain, and degenerative disc disease of the cervical spine. Such consideration is especially critical since plaintiff's obesity has been characterized by Dr. Glick as "morbid" (T182) and measured as a BMI of greater than 40 (T608).[4]

Defendant argues that ALJ Mazzarella properly discounted Dr. Glick's assessment of plaintiff's limitations because Dr. Glick did "not relate that his extreme functional restrictions were based on plaintiff's obesity on and prior to her date last insured" (Dkt. #12, p. 3). However, in his July 12, 2003 RFC assessment, Dr. Glick stated that plaintiff had been limited in these capacities since April 2001 (T295).

---

[4] "The Clinical Guidelines recognize three levels of obesity. Level I includes BMIs of 30.0-34.9. Level II includes BMIs of 35.0-39.9. Level III, termed "extreme" obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40." 2000 WL 628049 at *2.

2.      **ALJ Mazzarella Failed to Properly Assess Plaintiff's Credibility.**[5]

Although ALJ Mazzarella "accorded the claimant the benefit of the doubt with regard to her obesity superimposed on her other mild but significant impairments" (T395), he failed to specifically address the credibility of plaintiff's testimony that she would have to lay down or recline for thirty minutes every three to three and a half hours, and that if she was having bowel movements ("I'm always constipated"), the thirty minutes could be even longer (T716). Her credibility in this regard is critical in determining her capacity for employment, because as Vocational Expert Steinbrunner admitted, "generally you're not gonna get that kind of 30-minute lying down or reclining every three hours" (T728-729). Mr. Steinbrunner testified that even with respect to plaintiff's former job as a gambling cashier, "I'm not quite sure where the person would be afforded to lie down . . . I just don't know if there'd be a, accommodation there a bed or couch or something" (T728).[6]

Since ALJ Mazzarella found that plaintiff's obesity was a severe impairment (T608), it is certainly not inconceivable that this, in combination with her other impairments, would require her to lie down every three hours, especially in light of Dr. Glick's assessment of her limitations. "Symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone." SSR 96-7P, 1996 WL 374186, *1.

---

[5]      "Plaintiff did not raise the issue of whether the ALJ erred in his credibility determination. However, this Court is permitted to raise such issues *sua sponte* and does so in this case." Sanchez v. Astrue, 2008 WL 4368667, 3 n.2 (W.D.Ark. 2008).

[6]      Notwithstanding this testimony, ALJ Mazzarella found that plaintiff was capable of performing her past work as a gambling cashier (T397, ¶7), even though he had earlier found "that she could not perform her past relevant work" (T23).

Accordingly, plaintiff "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused *some degree* of the symptom." <u>Smolen v. Chater</u>, 80 F. 3d 1273, 1282 (9th Cir. 1996) (emphasis added).

ALJ Mazzarella's decision does not specifically indicate whether he found her testimony concerning her need to lie down to be credible or incredible. Instead, he states merely that "the claimant's complaints of total disability and pain and discomfort are not credible since the same were not consistent with the credible evidence of record on or prior to her date last insured" (T395). This generalized conclusion fails to satisfy the requirements of SSR 96-7P: "The determination or decision on credibility . . . must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." 1996 WL 374186, *2.

Because ALJ Mazzarella failed to properly evaluate plaintiff's credibility in that regard, I recommend that this case be remanded for reconsideration and clarification by the ALJ.[7] "Remand is particularly appropriate where, as here, we are 'unable to fathom the ALJ's rationale in relation to the evidence in the record' without 'further findings or clearer

---

[7] Should ALJ Mazzarella determine on remand that plaintiff's testimony that she needs to lay down or recline is credible, he should clarify with Vocational Expert Steinbrunner whether this limitation would (or would not) permit her to perform her past work as a gambling cashier or any other work, as his current testimony in this regard (T727-729) is less than conclusive. See <u>Kuleszo v. Barnhart</u>, 232 F.Supp.2d 44, 53 (W.D.N.Y. 2002) (Siragusa, J.) ("A vocational expert should identify specific existing occupations that would be suitable for the claimant and clarify the nature of the job openings to ensure that they do not require skills or exertion not possessed by the claimant.").

explanation for the decision.' " <u>Pratts v. Chater</u>, 94 F. 3d 34, 39 (2d Cir. 1996). Although

plaintiff urges that this case be remanded for a calculation of benefits because "this is the

second visit of this case to the district court" (plaintiff's Memorandum of Law (Dkt. #11), p.

12), "absent a finding that the claimant was actually disabled, delay alone is an insufficient

basis on which to remand for benefits." <u>Bush v. Shalala</u>,  94 F. 3d 40, 46 (2d Cir. 1996).

 However, since this case has already been remanded once, I recommend that this

court impose deadlines for further proceedings identical to those set in <u>Disarno v. Astrue</u>, 2008

WL 1995123, *6  (W.D.N.Y. 2008) (Curtin, J.):

> "In light of the long pendency of plaintiff's applications, the
> court--as well as the Commissioner--must be particularly
> 'mindful of the often painfully slow process by which disability
> determinations are made, and that a remand for further
> evidentiary proceedings (and the possibility of further appeal)
> could result in substantial, additional delay.' . . . . Therefore, the
> court directs that the further proceedings before the ALJ be
> completed within 60 days of the entry date of this order and, if
> that decision is a denial of benefits, a final decision of the
> Commissioner be rendered within 60 days of plaintiff's appeal
> from the ALJ's decision. If these deadlines are not observed, the
> Commissioner must make an immediate calculation of benefits
> then owed to plaintiff."

## CONCLUSION

 For these reasons, I recommend that defendant's motion for judgment on the

pleadings (Dkt. #8) be DENIED, that plaintiff's cross-motion (Dkt. #11) be  GRANTED, and

that the case be remanded to the Commissioner for further proceedings consistent with this

opinion. Pursuant to 28 U.S.C. §636(b)(1), it is hereby

ORDERED, that this Report and Recommendation be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co., 840 F. 2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn, 474 U.S. 140 (1985); Wesolek v. Canadair Ltd., 838 F. 2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules of Civil Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2)

(concerning objections to a Magistrate Judge's Report and Recommendation), may result in the

District Judge's refusal to consider the objection.

**SO ORDERED.**

DATED:      December 18, 2008

JEREMIAH J. MCCARTHY
United States Magistrate Judge